## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

GEORGIA OAK PARTNERS, LLC,

      Plaintiff,

v.

STONEHENGE PARTNERS, INC.,

      Defendant.

Civil Action File No.:

## **COMPLAINT**

Plaintiff Georgia Oak Partners, LLC ("Georgia Oak") files this Complaint against Defendant Stonehenge Partners, Inc. ("Stonehenge"), respectfully showing the Court as follows:

## **NATURE OF THE ACTION**

1.      This action arises out of Stonehenge's fraudulent misrepresentations and improper use of Georgia Oak's confidential information and trade secrets in connection with Stonehenge's severance of the parties' partnership to acquire Profile Custom Extrusion LLC ("PCE"), a manufacturer of aluminum extrusions located in Rome, Georgia.

-1-

2.      In August 2019, Georgia Oak and PCE agreed to a Letter of Intent ("LOI") for Georgia Oak to acquire PCE.  The LOI included an exclusivity period that barred PCE from engaging in negotiations with other potential buyers.

3.      In October 2019, Georgia Oak selected Stonehenge over three alternate, interested capital providers.  Georgia Oak and Stonehenge agreed to the core terms of their partnership and worked together throughout October 2019 to complete the acquisition of PCE.

4.      In reliance on that partnership, Georgia Oak granted Stonehenge access to its confidential, proprietary, and trade secret information about the deal, including analyses of the acquisition performed by Georgia Oak and its external accountants, attorneys, and advisors.

5.      But after an "all hands meeting" in Rome, Georgia on October 30, 2019, Stonehenge secretly decided to cut Georgia Oak out of the deal and to independently pursue the acquisition of PCE.  For over two months, Stonehenge concealed its plans from Georgia Oak, falsely representing to Georgia Oak that the deal was in "standby mode."  In addition, Stonehenge and its agents continued to use Georgia Oak's confidential and trade secret information after it had decided to cut Georgia Oak out of the deal.

6.      Georgia Oak's reliance on Stonehenge's fraudulent misrepresentations prevented Georgia Oak from using its knowledge of the deal, relationship with PCE, and offers from other capital providers to pursue a deal without Stonehenge, resulting in losses to Georgia Oak of at least $5 million.

## PARTIES, JURISDICTION AND VENUE

7.      Plaintiff Georgia Oak is a Delaware limited liability company with its principal place of business in Atlanta, Fulton County, Georgia.  Georgia Oak's members are all Georgia residents.  Georgia Oak is an investment firm that focuses exclusively on partnering with Georgia-based companies by facilitating control buyout or investing as a minority equity partner.

8.      Defendant Stonehenge is an Ohio corporation with its principal place of business at 191 W. Nationwide Blvd., Suite 600, Columbus, Franklin County, Ohio.  Stonehenge is private equity firm that invests in middle-market companies and partners with management teams to help them grow their businesses.

9.      Subject-matter jurisdiction exists because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b).  This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the related state and common-law claims pursuant to 28 U.S.C. § § 1367.

10.     This Court also has diversity subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000.

11.     This Court has personal jurisdiction over Stonehenge because this case arises out of Stonehenge's transaction of business in Georgia, including Stonehenge's travel to Rome, Georgia, and because Stonehenge caused tortious injury in Georgia and, on information and belief, regularly does and solicits business in Georgia.

12.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims have occurred and are occurring in this judicial district.

## FACTS

**Georgia Oak submits a successful bid to acquire PCE.**

13.     In the summer of 2019, Georgia Oak and Stonehenge each submitted separate, competing bids to acquire PCE, a manufacturer of aluminum extrusions based in Rome, Georgia.

14.     PCE selected Georgia Oak and, on August 14, 2019, Georgia Oak signed a LOI to acquire 100% of the equity of PCE.  The LOI included an

Exclusivity Period that barred PCE from engaging in negotiations with other potential buyers.

15.     PCE's investment bank, Brown Gibbons, Lang & Company ("BGL"), told Georgia Oak that PCE selected Georgia Oak because PCE's management preferred to work with Georgia Oak over the other bidders.

16.     The LOI also included a choice-of-law clause providing that the LOI "shall be governed by and construed in accordance with the laws of the State of Georgia," and a forum selection clause providing that all actions related to the LOI would be heard in Atlanta, Georgia.

17.     After executing the LOI, Georgia Oak received financials showing worse-than-expected results for PCE based on Seller/Management forecasted financials.

18.     Because of the forecasted financials, the primary bank Georgia Oak had planned to partner with reduced their credit appetite, and Georgia Oak decided to seek a partnership with a capital provider.

19.     In late September 2019, Georgia Oak reached out to a number of potential capital providers, including Stonehenge.

20.    Because Georgia Oak had agreed to a LOI with PCE, Stonehenge and the other potential capital providers understood that a partnership with Georgia Oak was essential to any potential acquisition of PCE.

21.    On September 30 and October 1, 2019, representatives from three potential capital providers visited PCE in Rome, Georgia.  All three expressed interest in the deal and submitted term sheets to Georgia Oak outlining the material terms and conditions of the proposed partnership.

22.    In addition to these three capital providers, Georgia Oak discussed the deal with Michael Arguelles, Stonehenge's Managing Director – Business Development.

23.    Through these discussions, Georgia Oak learned that Stonehenge had previously submitted a bid to acquire PCE in partnership with Calibre Group, LLC ("Calibre Group"), a Pittsburgh, Pennsylvania merchant bank with extensive knowledge and experience in the metals industry.  PCE had selected Georgia Oak's bid over Stonehenge's bid.

24.    On October 2, 2019, Michael Lonergan, the Founder and Managing Partner of Georgia Oak, and a number of other Georgia Oak employees met with Mr. Arguelles of Stonehenge and representatives of Calibre Group at Del Frisco's

in Dallas, Texas while the parties were attending a conference in Dallas.  During

the evening, the parties agreed that a partnership made sense for all sides.

**Georgia Oak and Stonehenge agree to partner in the acquisition of PCE.**

25.     Georgia Oak elected to partner with Stonehenge because Stonehenge

offered a favorable capital structure, including offering to contribute more equity.

Although Georgia Oak would have to cede control of the transaction to Stonehenge

and its agent, Calibre Group, the structure required Georgia Oak to invest less

equity and to take out less debt than the offers submitted by the other capital

providers.

26.     Between October 10, 2019 and October 30, 2019, Georgia Oak and

Stonehenge agreed to and began executing a plan to jointly acquire PCE.

27.     On October 10, 2019, Stonehenge sent to Georgia Oak (at its offices

in Atlanta, Georgia) an Outline of Economic Terms ("Term Sheet") that described

the terms of the partnership for the acquisition of PCE.  Georgia Oak sent

Stonehenge comments on the Term Sheet that same day.

28.     On October 11, 2019, Stonehenge circulated an updated version of the

Term Sheet that incorporated Georgia Oak's suggested changes.

29.    On October 15, 2019, Mr. Lonergan sent an email to Mr. Arguelles memorializing the parties' agreement to move forward with the partnership, stating: "We are agreed to move forward on these economic terms."

30.    Mr. Arguelles and Mr. Lonergan then participated in a phone call to discuss some additional details in the Term Sheet.  During the call, Mr. Arguelles reiterated his desire to partner with Georgia Oak on the acquisition of PCE, and the parties agreed to the core terms of their partnership.

31.    Mr. Lonergan then followed up with an email stating that he understood from the call that the Stonehenge and Georgia Oak were "on the same page."  Mr. Lonergan asked for clarification on a few items from Stonehenge so that Georgia Oak could inform the investment bank on the deal, BGL, about the planned partnership.

32.    Believing that Stonehenge and Georgia Oak had agreed to a partnership, Georgia Oak stopped shopping the deal to other capital providers.

33.    On October 18, 2019, Calibre Group, Stonehenge, and Georgia Oak participated in a call and discussed the need for all three to travel to Rome, Georgia to visit PCE and perform due diligence in anticipation of the acquisition.

34.    On October 20, 2019, Mr. Lonergan told Stonehenge that he had informed BGL that "Georgia Oak and Stonehenge . . . were working together" on

the PCE acquisition, and that the "partnership" between Georgia Oak and Stonehenge "was the best way to get a deal done." Mr. Lonergan suggested that Stonehenge connect directly with BGL to answer some follow-up questions.

35.    On October 22, 2019, Mr. Arguelles emailed Mr. Lonergan and agreed that it would make sense "for Stonehenge to have a quick call with BGL . . . to reiterate [Stonehenge's] interest in getting a deal done with [Georgia Oak] and PCE." Mr. Arguelles' email concluded: "Let's get a deal done, really looking forward to working with you guys."

36.    Between October 22 and October 29, Stonehenge and Georgia Oak communicated about the logistics and agenda for an "all hands meeting" at PCE's offices in Rome, Georgia.

37.    On October 29, representatives of Georgia Oak, Calibre Group, PCE, and BGL had dinner in Rome, Georgia. The partnership between Georgia Oak, Calibre Group, Stonehenge and PCE was a focal point of conversation throughout the evening.

38.    On October 30, 2019, Stonehenge employees Robert M. Eversole (Managing Partner), Nathan McGill (Director), and Marc Elberson (Senior Associate) traveled to Atlanta, Georgia to meet with Georgia Oak and visit PCE. Mr. Lonergan picked the Stonehenge employees up from the Atlanta airport and

drove them to PCE's office in Rome, Georgia.  On the way, the parties discussed

their plan to partner together, along with Calibre Group, to acquire PCE.

39.     After arriving in Rome, Georgia, they were joined by representatives

from Calibre Group for an "all hands meeting."  The purpose of the meeting was to

perform due diligence in an effort to complete the acquisition of PCE as partners.

**Georgia Oak's confidential, proprietary, and trade secret information.**

40.     In reliance on Stonehenge's agreement to partner, Georgia Oak

granted Stonehenge access to its confidential, proprietary, and trade secret

information about the PCE acquisition.

41.     Certain of Georgia Oak's confidential and proprietary information

constitute valuable trade secrets.

42.     Georgia Oak's trade secrets include internal financial models and

analyses about the PCE acquisition, as well as analyses performed by Georgia

Oak's external accountants, attorneys, and other advisors ("Trade Secrets").

43.     Georgia Oak invested heavily in its Trade Secrets, which provide

Georgia Oak an advantage over its private equity competitors.  According to well-

recognized industry practice and custom, private equity firms are required to invest

their own time and money into the preparation of deal analyses, including through

-10-

internal analysis and by contracting with external accountants, attorneys, and other advisors.

44.    Georgia Oak's Trade Secrets were not publicly known or generally known to its competitors in the private equity business, especially up to the time of the PCE acquisition.

45.    Georgia Oak engaged in efforts that are reasonable under the circumstances to maintain the secrecy of its Trade Secrets, including, but not limited to, restricting the Trade Secrets on a "need to know basis."  Under no circumstances would Georgia Oak ever share its Trade Secrets with a private equity firm that was preparing a competing bid.

46.     Georgia Oak's Trade Secrets were stored in a "Data Room" administered by Georgia Oak and hosted on "Onehub," a cloud based file sharing system that allows businesses to securely share and control files in a highly secure environment ("Data Room").

47.    The Trade Secrets in the Data Room were only accessible by permission of Georgia Oak.  Entry into the Data Room required the user to create a username and complex password, with a minimum of 10 characters.  Georgia Oak monitored activity in the Data Room and could track any access to the files in the

Data Room.  Georgia Oak could also limit or exclude users' access to the files in the Data Room.

48.    One of the most sensitive and valuable files in the Data Room was the "Moore Colson Report," a Financial Due Diligence Report created for Georgia Oak by an outside accounting firm, Moore Colson & Company, P.C. ("Moore Colson"), a Georgia corporation with its principal place of business in Atlanta, Cobb County, Georgia.

49.    Georgia Oak invested heavily in the Moore Colson Report, which analyzed PCE's operations, accounts balances, and operating procedures.  Moore Colson obtained the information in the Moore Colson Report through discussions with PCE's officers and accounting personnel and review of PCE's financial information.

50.    The Moore Colson Report was created for the benefit of Georgia Oak. Georgia Oak requested and agreed to pay Moore Colson to create the Moore Colson Report.  The Moore Colson Report was intended for Georgia Oak's use to evaluate the merits of the PCE acquisition.

51.    Georgia Oak's engagement letter with Moore Colson provides that the Moore Colson Report would "be restricted to [Georgia Oak's] internal use only,"

and could "be shared with other third parties" only "upon a third party's execution of an access letter."

52.     On October 11, 2019, Stonehenge signed a confidentiality agreement allowing Stonehenge access to the Moore Colson Report ("Confidentiality Agreement").  The Confidentiality Agreement granted Stonehenge access to the Moore Colson Report only for the purpose of "making an investigation of [PCE]" "[i]n connection with [Georgia Oak's] potential acquisition" of PCE.  Stonehenge agreed "the information obtained from [its] review [of the Moore Colson Report] will not be used by [Stonehenge] for any other purpose."

53.     Georgia Oak subsequently requested access, pursuant to the Confidentiality Agreement, for additional employees and agents, including Robert Eversole and employees of Calibre Group.

54.     In conducting due diligence on the PCE acquisition, Calibre Group acted as an agent of Stonehenge.  Stonehenge authorized Calibre Group to lead the due diligence effort on its behalf, and Calibre Group acted at the direction of and on behalf of Stonehenge.

**Stonehenge falsely represents that the deal is in "standby mode."**

55.     During and following the "all hands meeting" in Rome, Georgia on October 30, 2019, Georgia Oak reasonably believed – based on Stonehenge's

-13-

statements and conduct leading up to and during the "all hands meeting" – that Georgia Oak, Stonehenge, and Calibre Group were going to partner together to acquire PCE.

56.     Because of the structure of the deal, Stonehenge and its agents, Calibre Group, led the due diligence process following the "all hands meeting," and led the effort through the use of Georgia Oak's Trade Secrets.

57.     On or around the time of the "all hands meeting" on October 30, 2019, Stonehenge decided to cut Georgia Oak out of the deal, and to pursue an acquisition of PCE without Georgia Oak.

58.     On November 6, 2019, Mr. Lonergan reached out to Mr. Eversole of Stonehenge and asked to discuss the status of the PCE acquisition.  Mr. Eversole responded: "Calibre is reaching out to BGL with thoughts on valuation.  We await word on that."

59.     On November 14, 2019, in response to another request for an update by Mr. Lonergan, Mr. Eversole stated that the deal was in "standby mode" and asked if Georgia Oak "was still interested in investing."  Mr. Lonergan responded: "Yes we are."

60.     On November 20, 2019, Mr. Eversole responded to yet another request for an update by Mr. Lonergan, stating: "We're still in standby here."

61.     On December 4, 2019, after the Thanksgiving holidays, Mr. Lonergan again reached out to Mr. Eversole and asked for a status update.  He explained that Georgia Oak "expected that we would be working together on this phase of diligence and would have access to Stonehenge/Calibre work product, as you guys had access to our work and diligence report."

62.     On December 5, 2019 Mr. Eversole responded: "I don't have an update to share so that's why I haven't sent anything along."

63.     On January 8, 2020, after hearing nothing from Stonehenge for over a month, Mr. Lonergan explained to Mr. Eversole that Georgia Oak "assumed that there has been nothing actionable and that you all were still in stand-by per your last email."  He reminded Stonehenge that Georgia Oak "had an exclusive LOI" with PCE, that Georgia Oak had brought Stonehenge into the deal, and that Georgia Oak "put a lot of faith in the communication we had with your firm and Calibre ahead of collectively deciding to inform [BGL/PCE] that we are working together."  He asked: "if there has been a change in heart of working together, lets have that conversation.  We have advisor fees now due and spent a great deal of time on the transaction."

64.     Mr. Lonergan also informed Mr. Eversole that Georgia Oak could see, as recently as January 7, "heavy activity by Calibre reviewing the Georgia Oak

data room – our work product, as well as our 3rd party diligence reports."  The

heavy access of the data room ceased that very day.

65.     On January 13, 2020, Mr. Lonergan requested a status update from

both Mr. Eversole and Mr. Arguelles.

**Stonehenge reveals that the deal had not been in "standby mode," and that Stonehenge had decided to cut Georgia Oak out.**

66.     On January 13, 2020, Mr. Arguelles responded and, contradicting Mr.

Eversole's prior representations that the deal was "in standby mode," told Georgia

Oak: "A lot has transpired since our last discussion on October/November from a

deal perspective, it's been a total reset! New purchase price negotiations, new

working capital discussions, accounting diligence, customer diligence, new Calibre

LOI . . . and still working on a number of outstanding diligence issues . . . ."

67.     On January 14, 2020, Mr. Lonergan responded that this was

"surprising news," and that Georgia Oak had assumed from Mr. Eversole's

communications that the deal was in standby mode.  He reminded Stonehenge that

Georgia Oak selected Stonehenge "[d]espite having 3 other options for capital

providers," and that it agreed to "cede the driver's seat on this deal to you guys

because we valued the collective partnership."  Mr. Lonergan stated that Georgia

Oak had "been cut off from the process that we agreed would be conducted as a

collective team."  He then requested a call to discuss next steps.

-16-

68.     On January 22, 2020, Stonehenge told Georgia Oak during a telephone call that it had decided to cut Georgia Oak out of the deal, and that Stonehenge and Calibre Group had agreed to an LOI with PCE and were moving forward with an acquisition of PCE without Georgia Oak.

69.     Although Georgia Oak had repeatedly and continually requested updates and expressed interest in the deal, Stonehenge claimed it had cut Georgia Oak out of the deal because Stonehenge believed Georgia Oak no longer wanted to work with Stonehenge.

70.     Stonehenge and its agents, including employees of Calibre Group, continued to use and access Georgia Oak's Trade Secrets, including the Moore Colson Report, after Stonehenge had stopped pursuing an acquisition with Georgia Oak and began actively working against Georgia Oak.

71.     From October 31, 2019, until January 7, 2020, Stonehenge and its agents accessed Trade Secrets in Georgia Oak's Data Room, including the Moore Colson Report, more than 100 times.

72.     Stonehenge and its agents only stopped accessing Georgia Oak's Trade Secrets after Georgia Oak reminded Stonehenge, on the morning of January 8, 2020, that it had visibility into activity in the Data Room.

**Georgia Oak suffered harm as a result of Stonehenge's conduct.**

73.     Stonehenge's repeated misrepresentations to Georgia Oak about the status of the deal were intended to and did conceal the developments in the deal from Georgia Oak, including Stonehenge's decision to cut Georgia Oak out of the deal.

74.     Georgia Oak's reasonable reliance on Stonehenge' misrepresentations prevented Georgia Oak from using its knowledge of the deal, relationship with PCE, and offers from other capital providers to pursue a deal without Stonehenge.

75.     By January 22, 2020, when Stonehenge finally informed Georgia Oak that it had been secretly negotiating a deal to acquire PCE without Georgia Oak, it was too late for Georgia Oak to identify an alternate capital provider and pursue an acquisition of PCE without Stonehenge.

76.     Stonehenge's actionable conduct caused Georgia Oak to lose out on the acquisition of PCE, resulting in the loss of at least five million ($5,000,000.00) dollars.

## CLAIMS FOR RELIEF

### Count I:     Fraud

77.     Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

78.     Stonehenge made repeated, false representations and omissions to Georgia Oak about the status of its negotiations with PCE.

79.     Stonehenge falsely represented that the acquisition was in "standby mode," and that Stonehenge had no updates to share.  Stonehenge omitted and concealed that Stonehenge and Calibre Group were negotiating a deal to acquire PCE without Georgia Oak.

80.     Stonehenge intentionally made these false representations and omissions in order to induce Georgia Oak to refrain from pursuing the acquisition of PCE without Stonehenge.

81.     Georgia Oak justifiably relied on Stonehenge's representations, including by not using its knowledge of the deal, relationship with PCE, and offers from other capital providers to pursue a deal without Stonehenge.

82.     Georgia Oak has been and continues to be damaged in an amount to be proven at trial as a result of Stonehenge's misrepresentations, including the loss of the opportunity to acquire PCE.

83.     Georgia Oak is therefore entitled to judgment in its favor and to compensatory and punitive damages in amount to be proved at trial.

**Count II:**     **Misappropriation of Trade Secrets, Defend Trade Secrets Act, 18 U.S.C. § 1836(b)**

84.    Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

85.    The confidential and proprietary information and documents in the Data Room, including Georgia Oak's internal financial models about the PCE acquisition and the analyses performed by Georgia Oak's external accountants, attorneys, and other advisors, including the Moore Colson Report, constitute "trade secrets" under 18 U.S.C. 1839(3).

86.    Georgia Oak took reasonable measures under the circumstance to keep its Trade Secrets secret, including by restricting the Trade Secrets on a "need to know" basis, entering into confidentiality agreements to limit use of the Trade Secrets, storing the Trade Secrets in a secured and administered cloud file sharing system, requiring persons who viewed the Trade Secrets to create a username and password, and monitoring, tracking, and limiting access to the Trade Secrets.

87.    Georgia Oak invested heavily in its Trade Secrets, which derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

-20-

88.     Stonehenge misappropriated Georgia Oak's Trade Secrets. Stonehenge acquired the Trade Secrets under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit use of the Trade Secrets only to the pursuit of an acquisition of PCE with Georgia Oak.  Stonehenge breached that duty of secrecy and limited use by continuing to use Georgia Oak's Trade Secrets to pursue an acquisition of PCE after it had decided to cut Georgia Oak out of the deal.

89.     Stonehenge's misappropriation of Georgia Oak's Trade Secrets has caused Georgia Oak substantial injury and unjustly benefited Stonehenge, including but not limited to revenue lost as a result of Georgia Oak's failure to acquire PCE and to the costs saved by Stonehenge through the use of the Trade Secrets.  Georgia Oak is therefore entitled to an award of actual damages in an amount to be proven at trial.

90.     Stonehenge's misappropriation of Georgia Oak's Trade Secrets was conducted in a willful and malicious manner.  Georgia Oak is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount not exceeding two times the award of compensatory damages, as well as to an award of its reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

**Count III:   Misappropriation of Trade Secrets, Georgia Trade Secrets Act, O.C.G.A. § 10-1-761, *et seq*.**

91.   Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

92.   The confidential and proprietary information and documents in the Data Room, including Georgia Oak's internal financial models about the PCE acquisition and the analyses performed by Georgia Oak's external accountants, attorneys, and other advisors, including the Moore Colson Report, constitute "trade secrets" under O.C.G.A. § 10-1-761(4)

93.   Georgia Oak took reasonable measures under the circumstances to keep its Trade Secret information secret, including by restricting the Trade Secrets on a "need to know" basis, entering into confidentiality agreement to limit use of the Trade Secrets, storing the Trade Secrets in a secured and administered cloud file sharing system, requiring persons who viewed the Trade Secrets to create a username and password, and monitoring, tracking, and limiting access to the Trade Secrets.

94.   Georgia Oak invested heavily in its Trade Secrets, which derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

-22-

95.     Stonehenge misappropriated Georgia Oak's protected Trade Secrets. Stonehenge acquired the Trade Secrets under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit use of the Trade Secrets only in connection with the pursuit of an acquisition of PCE with Georgia Oak. Stonehenge breached that duty of secrecy and limited use by continuing to use Georgia Oak's Trade Secrets to pursue an acquisition of PCE after it had decided to cut Georgia Oak out of the deal.

96.     Stonehenge's misappropriation of Georgia Oak's Trade Secrets has caused Georgia Oak substantial injury, including but not limited to revenue lost as a result of Georgia Oak's failure to acquire PCE.  Georgia Oak is therefore entitled to an award of actual damages in an amount to be proven at trial.

97.     Stonehenge's misappropriation of Georgia Oak's Trade Secrets was conducted in a willful and malicious manner.  Georgia Oak is therefore entitled to exemplary damages under O.C.G.A § 10-1-763, in an amount not exceeding two times the award of compensatory damages, as well as to an award of its reasonable attorneys' fees under O.C.G.A. § 10-1-764.

**Count IV**:   **Breach of Confidentiality Agreement**

98.     Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

-23-

99.   The Confidentiality Agreement between Georgia Oak's accounting firm, Moore Colson, and Stonehenge is a valid and enforceable agreement.

100.   Georgia Oak is a third-party beneficiary of the Confidentiality Agreement.  The Confidentiality Agreement was intended to protect the confidential information created by Moore Colson for the benefit of Georgia Oak, including the Moore Colson Report.

101.   Stonehenge agreed to use the confidential information created by Moore Colson for the benefit of Georgia Oak, including the Moore Colson Report, only "[i]n connection with [Georgia Oak's] potential acquisition" of PCE, and that "the information obtained from [its] review will not be used by [Stonehenge] for any other purpose."

102.   Calibre acted as an agent of Stonehenge in conducting due diligence on the PCE acquisition.

103.   Stonehenge and its agents materially breached the terms of the Confidentiality Agreement by using the confidential information created by Moore Colson for the benefit of Georgia Oak, including the Moore Colson Report, after it stopped pursuing an acquisition of PCE with Georgia Oak.

104.   As a result of Stonehenge and its agents' breach of the Confidentiality Agreement, Georgia Oak suffered compensatory damages.  Georgia Oak is entitled

to recovery of all such actual and consequential damages, including the amounts paid to Moore Colson to generate the confidential information created by Moore Colson, and the revenue lost due to Georgia Oak losing out on the acquisition of PCE, as well as pre- and post-judgment interest, in an amount to be proven at trial.

**Count V:    Promissory Estoppel**

105.   Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

106.   Stonehenge promised it would partner with Georgia Oak to acquire PCE.  Stonehenge's course of conduct throughout October 2019 was consistent with Georgia Oak and Stonehenge pursuing the PCE acquisition as partners. Stonehenge made no representations that it did not plan to partner with Stonehenge until January 22, 2020.

107.   Stonehenge's promise to partner with Georgia Oak was clear and unambiguous.

108.   Georgia Oak reasonably relied on Stonehenge's promise to partner with Georgia Oak to acquire PCE, including by refraining from using its knowledge of the deal, relationship with PCE, and offers from other capital providers to pursue a deal without Stonehenge.

109.   Stonehenge expected and could foresee that Georgia Oak would rely on its promise.

110.   Georgia Oak has been and continues to be damaged in an amount to be proven at trial as a result of Stonehenge's failure to abide by its promises.

**Count VI:   Unjust Enrichment**

111.   Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

112.   At the request of and with the knowledge of Stonehenge, Georgia Oak conferred a benefit on Stonehenge by granting it access to Georgia Oak's confidential and proprietary information and documents in the Data Room, including Georgia Oak's internal financial models about the PCE acquisition and the analyses performed by Georgia Oak's external accountants, attorneys, and other advisors, including the Moore Colson Report.

113.   Georgia Oak invested heavily in creating its confidential deal information, including agreeing to pay approximately $230,000 in fees to its accountants, attorneys, and other advisors.

114.   Stonehenge benefitted through its improper use of Georgia Oak's confidential deal information.

115.   Stonehenge has not compensated Georgia Oak for the benefit Georgia Oak conferred on Stonehenge.

116.   Under the circumstances, it would be unjust and inequitable to allow Stonehenge to retain that benefit without fully compensating Georgia Oak for the full market value of the confidential information Stonehenge used to its benefit.

117.   Georgia Oak has been and continues to be damaged in an amount to be proven at trial as a result of Stonehenge's unjust enrichment.

**Count VII:  Litigation Expenses, O.C.G.A. § 13-6-11**

118.   Georgia Oak incorporates paragraphs 1 through 77 as if fully restated herein.

119.   O.C.G.A. § 13-6-11 authorizes a plaintiff to collect costs and attorneys' fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

120.   Stonehenge has been stubbornly litigious and has acted in bad faith in a manner that has caused unnecessary harm and expense to Georgia Oak, entitling Georgia Oak to recover its reasonable litigation expenses and attorneys' fees incurred in this action pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE**, Georgia Oak requests the following relief:

(a)    That the Court enter judgment in favor of Georgia Oak and against Stonehenge for all compensatory damages suffered by Georgia Oak;

(b)    That the Court permanently enjoin Stonehenge, and its agents, employees, and all persons in active concert or participating with Stonehenge, from using Georgia Oak's trade secrets and confidential information;

(c)    That the Court award Georgia Oak its attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11, O.C.G.A. § 10-1-764, and 18 U.S.C. § 1836(b)(3)(D).

(d)    That a jury trial be had on all issues so triable; and

(e)    That the Court award such other relief as this Court deems just and proper.

Respectfully submitted this 13th day of March 2020.

KILPATRICK TOWNSEND &
    STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
jjett@kilpatricktownsend.com
jfisher@kilpatricktownsend.com
bherbert@kilpatricktownsend.com

/s/ Jeffrey H. Fisher
John P. Jett
Georgia Bar No. 827033
Jeffrey H. Fisher
Georgia Bar No. 981575
Brittany Herbert
Georgia Bar No. 230996

*Attorney for Georgia Oak Partners, LLC*